# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

*In the Matter of the Search of*

The premises located at 3718 West Lancaster, Milwaukee, Wisconsin.
(for further description see Attachment A)

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NO. 10-M-0204

I, Mitchell G. Ward, being duly sworn depose and say: I am a Detective with the Milwaukee Police Department and have reason to believe that within the property known as: The premises located at 3718 West Lancaster, Milwaukee, Wisconsin (for further description see Attachment A).

in the Eastern District of Wisconsin, there is now concealed certain property, namely: (See Attachment B), which is evidence of a crime, namely wire fraud in violation of Title 18, United States Code, Section 1343.

The facts to support a finding of Probable Cause are as follows: See the attached affidavit.

Continued on the attached sheet and made a part hereof. ✔ Yes   No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

January 14, 2010 at 3:00 pm.
Date and time issued

at Milwaukee, Wisconsin
City and State

Patricia J. Gorence, U.S. Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

## ATTACHMENT A

The premises to be searched with the warrant for which the United States is applying is more completely described as:

A red brick two-story commercial building located at the northwest corner of North 37th Street and West Lancaster. The main entrance is located on the south face of the building. The main entrance is a full length glass door with the numbers 3718 affixed to the door in red letters.

The building also contains a warehouse area on the north side of the first floor leased to CC Electric which contains electric supplies and equipment. While access to this warehouse area can be gained from the day care facility, that would be through a locked door and the search sought through the warrant in this matter will not include this warehouse area.

ATTACHMENT B

Records of child care businesses operated by Latasha Jackson from 2001 to the present, including but not limited to, Kiddie Springs Child Development Center and Latasha's Learning Enterprise. The records would include but not be limited to attendance records, sign-in sheets, enrollment applications and other enrollment records, tuition payment records, correspondence to or from the State of Wisconsin Department of Work Force Development, Department of Children and Families, and or the Milwaukee County Department of Health and Human Services, internal memos regarding participation in State or County reimbursed childcare programs, memos or other documents relating to the expenditure of funds received or expected to be received from the State of Wisconsin by the business: financial records including bank statements, check registers and cash disbursement journals, cancelled checks or other financial records; any computers; and any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. The media includes but is not limited to floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, video cassettes, optical media, USB flash drives, CD-ROMs, and any other media which is capable of storing magnetic coding.

Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include, but are not limited to computers, computer components, computer

peripherals, word processing equipment, modems, monitors, printers, plotters, encryption circuit boards, optical scanners, external hard drives, and other computer related electronic devices.

Any and all instructions or programs stored in the form of electronic or magnetic media which are capable of being interpreted by a computer or related components. The items to be seized include but are not limited to operating systems, application software, utility programs, compilers, interpreters and any other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission. Any and all written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device.

A computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to store computer files described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer forensic examiner or another technical expert will then conduct an off-site search for the computer files described in the warrant from the image copy at a later date. If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system.

If such computer equipment as described cannot be analyzed at the search site, the warrant allows for seizure of such equipment and removal from the premises for analysis. In that event, the government will furnish to the issuing Magistrate Judge, every 14 days after the warrant is returned, a status update regarding the analysis being conducted. These updates will continue to be submitted until the analysis is complete or until further order of the court. If it is determined that the computer is contraband because it was used in furtherance of criminal activity or constitutes fruits of said criminal activity, then the government will report this to the issuing Magistrate Judge, and will request that such reporting obligation cease and that it be allowed to maintain custody of the computer. If the computer is determined not to be contraband or fruits of said criminal activity and is determined not to be otherwise subject to seizure by the government, then the government agrees to return the computer equipment upon completion of the analysis.

In conducting the search authorized by this warrant, whether performed on site or in a laboratory, or other controlled environment, the government shall make reasonable efforts to utilize computer search methodology to search for only files, documents or other electronically stored information which are identified in the warrant itself and any attachments thereto.

The search methodology may include, but is not limited to, the following techniques:

a. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

b. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

c. "scanning" storage areas to discover and possibly recover recently deleted data;

d. scanning storage areas for deliberately hidden files; and

e. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

This warrant and this search procedure specifically excludes a search of any kind of unopened electronic mail. No search of unopened electronic mail shall be conducted without a separate search warrant supported by probable cause. Appropriate efforts shall be made to minimize the disclosure of records and other information that are not the subject of this warrant.

As to any computer files that are discovered to be relevant, the government is authorized to search the underlying metadata of that file which will reveal information such as when the files were created, when they may have been modified, and by whom.

# AFFIDAVIT

Mitchell G. Ward, being first duly sworn on oath, hereby deposes and says:

1. I am a Detective with the Police Department of the City of Milwaukee, Wisconsin. I have been an officer of that department since 1992 and a Detective since 2007.

2. As part of my duties as a Detective, I have participated in investigations of allegations against more than ten day care centers for defrauding the Wisconsin Works (W-2) program. Several of these investigations are still pending and several have resulted in criminal charges being filed against the day care operators in Milwaukee County Circuit Court.

3. As a result of my participation in these investigations, I have become familiar with the W-2 program.

4. I make this affidavit in support of an application for a warrant to search the Kiddie Springs Child Development Center at 3718 West Lancaster in Milwaukee. I have observed that building and would describe it as follows:

> A red brick two-story commercial building located at the northwest corner of North 37th Street and West Lancaster. The main entrance is located on the south face of the building. The main entrance is a full length glass door with the numbers 3718 affixed to the door in red letters. The building also contains a warehouse area on the north side of the first floor leased to CC Electric which contains electrical supplies and equipment. While access to this warehouse area can be gained from the day care facility, that would be through a locked door and the search sought through the warrant in this matter will not include this warehouse area.

5. The information in this affidavit comes from my personal observation, records obtained from the State of Wisconsin and the County of Milwaukee, and information I have received from other investigators in the case including Detectives from the Milwaukee Police Department and Special Agents from the FBI, IRS, and ATF, as well as arson investigators from the Wisconsin State Fire Marshal's Office and the Menomonee Falls Police Department.

6. Child care centers such as Latasha's Learning Enterprise and Kiddie Springs are licensed by the State of Wisconsin pursuant to the W-2 program. That program is federally funded through the United States Department of Health and Human Services but administration of that program is delegated to the state. The W-2 program is meant to help economically disadvantaged single mothers obtain and maintain full-time employment. One problem such mothers face in obtaining such employment is finding day care for their children if they are working. So, if the mother is able to obtain full-time employment, the W-2 program pays for day care at a licensed child care center. The state regulates the number of children who may attend and the hours that the center may operate. By agreement with the state, Milwaukee County provides authorization to individual children making them eligible to enroll and receive these public day care funds.

7. The county requires centers to maintain daily sign-in sheets that list the children in attendance and the hours that they attended. The centers submit attendance

2

information electronically to the State of Wisconsin on a bi-weekly basis and then receive payment from the state by wire transfer. I have received information from the State of Wisconsin which reflects that the wire transfers to the child care centers go from Wisconsin to a bank in Minnesota and then to the individual child care center accounts within Wisconsin. A center is not allowed to bill the state for children who are not actually attending the center or for hours that the children did not attend the center.

8. Records obtained from the Department of Children and Families of the State of Wisconsin indicate that Latasha Jackson operated licensed child care centers under the W-2 program from 2001 through 2009. Through these years, with a few gaps for temporary suspensions of her license, Ms. Jackson continuously operated child care centers through five locations in the City of Milwaukee:

- 4735 North 74th Street
- 3313 North 10th Street
- 2400 West Capitol Drive
- 8713 West Fond du Lac Avenue
- 3718 West Lancaster

The first three locations operated under the name of Latasha's Learning Enterprise while the last two have used the business name Kiddie Springs Child Development Center.

9. Records obtained from the Department of Children and Families (DCF) show that, over these years, Ms. Jackson's child care centers gradually increased the number of children they were licensed to care for and the number of hours they were licensed to care for children. In 2001, Ms. Jackson was licensed to care for eight

3

children from 7:00 a.m. to 7:00 p.m. By 2005 and after, Ms. Jackson was licensed to care for as many as 134 children from 6:00 a.m. through 11:30 p.m., seven days a week.

10.     Based on my experience in investigating child care fraud against the W-2 program, I have observed that the frauds often follow a similar pattern. The child care centers need the cooperation of mothers in the W-2 program. Those mothers have to be employed full-time in order to qualify for child care benefits. The mothers need to agree to have their children listed as being cared for by a particular child care center in order for that center to be reimbursed for the child care. Child care operators recruit women qualifying for the W-2 program, especially if those women have multiple children. The child care centers agree to employ the women if they will commit their children to the rolls of that child care center. The center then alleges that they are employing these mothers full time and are going to be caring for their children eight hours or more per day. In fact, the women are not employed full-time and the children are not cared for nearly as many hours as are claimed for billing purposes but the child care center gets paid for all of this child care by the state with federal money. The result is large overpayments for child care which was not provided by the center. In this fraud, the more children a child care center can claim reimbursement for, the larger the overpayment.

11.     Ms. Jackson's child care centers have been subject to periodic compliance visits by licensing specialists from DCF. I have interviewed two of the licensing

4

specialists and reviewed their records which include notations of various violations of state regulations including:

- Lack of accurate attendance records in 2001, 2002, 2003, 2005 and 2006.
- On three visits in 2001 and two or three in 2004, during the day, the licensing specialist came for a compliance visit but found the doors locked and no one apparently at the child care center.
- On various occasions, the licensing specialists only observed a few children present in Ms. Jackson's child care center.

12. I was present at a recent interview of Witness A who is a mother who is a participant in the W-2 program. Witness A knew Latasha Jackson because her daughter had been enrolled in Latasha's Learning Enterprise for about six months several years ago. In late 2008, Ms. Jackson called Witness A and asked her to enroll Witness A's daughter in Kiddie Springs but Witness A refused because she did not need child care. In late 2008 or early 2009, the county notified Witness A that she was receiving unauthorized child care benefits as a result of care for her child at Kiddie Springs. However, her child had never attended Kiddie Springs. Witness A was shown documents containing to what purported to be her signature regarding her daughter's attendance at Kiddie Springs but states that those signatures were forged.

13. I was present at a recent interview of Witness B, a Somali immigrant, who worked for Kiddie Springs in 2009. Witness B states she was one of many Somali women working there in 2009. She states that, as a condition of being employed there, she had to enroll her children as attending Kiddie Springs. Witness B was listed as a full-time employee but she stated that she and the other Somali women were only there

5

about three hours per day. She was listed as working from 3:00 to 11:00 p.m. but normally was only there from 5:00 to 8:00 p.m. Then she would go home with her children because there were no other children there to be cared for. Witness B states that in August of 2009, Kiddie Springs was visited by state regulators. After that, Ms. Jackson told the employees that the state was watching her and now they would have to work all scheduled hours. Kiddie Springs closed very soon thereafter.

14. I was present at a recent interview of Witness C, a mother who is a participant in the W-2 program. Witness C states that she met Latasha Jackson in 2005. Ms. Jackson offered Witness C a job at Latasha's Learning Enterprise. Witness C never took that job and her six children eligible for child care assistance never attended Latasha's Learning Enterprise. However, Witness C later learned that Latasha's Learning Enterprise was billing the state to care for Witness C's children from February through July, 2005 even though they never attended that day care center.

15. I was present at a recent interview of Witness D who is a mother who is a participant in the W-2 program. Witness D stated that she had earlier worked for Latasha's Learning Enterprise. In 2009, she worked at Kiddie Springs from March through August, from 3:00 to 11:00 p.m. Witness D states that there were nine or ten Somali women there with their children. She stated that the Somali women would arrive at 3:00 or 4:00 p.m. and would be gone by 8:00 p.m. Later, they would stay longer hours

6

but the Somali women never came to work on Fridays due to their religion. Witness D estimated that there were nine or ten Somali adults involved with 65 to 70 children.

16. I was present at a recent interview of Witness E who is a mother who is a participant in the W-2 program. Witness E stated that she worked at Kiddie Springs at the Fond du Lac and Lancaster locations. She worked from November of 2008 through August of 2009 when Kiddie Springs closed. Witness E knew that all five of her children were enrolled at Kiddie Springs but they were only present there five or six days out of the time she worked there. Records from the State of Wisconsin show that the state was billed for Witness E's children five days a week throughout the period that Witness E worked for Kiddie Springs. Witness E was responsible for a preschool classroom. She stated that she would keep attendance records at her classroom but Ms. Jackson asked her to stop marking A on her records for absent when children were not there because it was too hard to whiteout all those As. In August of 2009, Ms. Jackson said that she was under scrutiny from the newspaper so employees would have to stay throughout their shifts.

17. I am aware that, in recent months, the Milwaukee Journal-Sentinel has run a series of articles regarding alleged frauds in the W-2 program, some of which focused on Latasha Jackson's child care centers.

18. I recently interviewed Witness F who is a participant in the W-2 program who stated that she had worked at Ms. Jackson's child care centers since November of

7

2007. During that time, Witness F was aware that Latasha's Learning Enterprise and Kiddie Springs had been billing the state to care for Witness F's children. However, during that time, the children were living in Gary, Indiana and were seldom, if ever, present at any of Ms. Jackson's child care centers.

19. Roberta Canady, who is an investigator for Milwaukee County, has provided information indicating that Latasha Jackson, through her various day care centers, has been paid a total of $2,953,347.89 in child care payments through her facilities from 2002 through 2009.

20. I have interviewed an administrative coordinator for the child care program working for Milwaukee County who formerly operated child care centers herself. She had told me that, based upon her experience with child care centers, she would expect that the profit margin for a child care center after subtracting various overhead items such as employee costs, supplies, facilities, and taxes, would be certainly less than 10%.

21. As part of the investigation, records of various large expenditures by Latasha Jackson in recent years have been obtained. In 2007, she moved into a newly constructed house on Goetz Court in Menomonee Falls, Wisconsin. The house was valued at well over $1 million. I have reviewed her loan application for the construction loan to build that house. The total cost was alleged to be $1,402,000. The loan requested was $1,120,000. Ms. Jackson stated that a down payment would be made from her checking and saving accounts. She listed monthly employment income at Latasha's

8

Learning Enterprise as $20,888. She listed assets including $137,000 in bank accounts and $930,000 in other real estate.

22. I have received information from a Milwaukee jeweler indicating that Ms. Jackson and the man she married in 2009, Greg Wilder, ordered a four-piece ring collection for their wedding which cost a total of $69,710. Ms. Jackson paid $51,000 to the jeweler in 2009 on this set and still owes the balance.

23. The witnesses that have been interviewed who worked at Ms. Jackson's child care centers all agreed that the centers kept various attendance records including a general sign-in sheet reflecting all of the children who had attended the center on any given day as well as individual class room attendance sheets reflecting the children who were present in each class room each day. Those records also reflected the number of hours that each child was present at the center. As part of the investigation, other investigators and I have already obtained from the state records of the child care reimbursements claimed by Ms. Jackson for her day care centers, listing the children she claimed to have cared for and the hours she claims those children were present at her day care centers. A comparison of the internal records maintained by Ms. Jackson with the billing records submitted to the state would be relevant to proving whether those billing records are false. Those records would also be expected to shed light on whether the individuals claimed to be employees at the day care centers were actually working there and, if so, for how many hours a day. If they were mothers participating in the W-2

9

program but were not working full-time, their children would not be eligible to have any child care center reimbursed by W-2 funds to care for them.

24. A licensing specialist from DCF who was responsible for monitoring Ms. Jackson's child care centers from 2007 through 2009 has stated that she visited the facility on Lancaster in 2009 and recalls that Ms. Jackson kept her records in an office in that building behind the entrance room.

25. In an administrative hearing on December 2, 2009, Ms. Jackson testified that she kept records at Lancaster. She described an incident in which Ms. Canady came to that center in 2009 and asked for records. Copies were made for Ms. Canady as she waited at that facility.

26. The owner of the building on Lancaster was interviewed. He has stated that Ms. Jackson has been paying rent and maintaining that facility as a child care center. She has told him that she is trying to get her day care license back so has to maintain a child care facility and is maintaining her records.

27. I have gone past that building and observed it recently. It is not presently being used as a day care but the day care decorations are still up and it appears ready to resume business if Ms. Jackson would get her license back.

28. The witnesses who have worked for Ms. Jackson have referred to her maintaining paper records as well as computerized records. I was present at a recent interview of Witness G who has worked for Ms. Jackson in her various child care centers

since 2004. Witness G stated that the centers maintained attendance records for all children attending and that the centers used classroom attendance sheets, a master sheet covering all children, and computers. Witness G saw these records at Kiddie Springs on Lancaster during December, 2009.

29. As mentioned above, I have worked on investigating more than ten cases involving allegations of child care fraud against the W-2 program. In every one of these cases, the child care center had records of the child care operation which were maintained at the facility used by that center. Maintenance of child attendance and employee certification records are required by the rules of the W-2 program to be retained on-site.

30. Since 2007, Ms. Jackson has been living in the house on Goetz Court in Menomonee Falls. In late December of 2009, that house was destroyed by fire. I have talked to arson investigators from the State Fire Marshal's Office and Menomonee Falls police who have been through that building after the fire. They informed me that they found no evidence of any records maintained there. They did find what appeared to be an office area in the basement of the house. There was no evidence of records maintained there although the basement area was not burned.

31. Based upon the size and nature of the business that was being conducted by Ms. Jackson as well as the program requirements that require certain records to be kept by program participants as well as my training and past experience investigating

11

businesses of this type, affiant believes that financial and business records belonging to Kiddie Springs are located at the premises at 3718 West Lancaster. These records may include attendance records, sign-in sheets, enrollment applications and other enrollment records, tuition payment records, correspondence to or from the State of Wisconsin Department of Work Force Development and or the Milwaukee County Department of Health and Human Services, internal memos regarding the center's participation in State or County reimbursed child care programs, memos or other documents relating to the expenditure of funds received or expected to be received from the State of Wisconsin by the center, bank records including bank statements, check registers and cash disbursement journals, cancelled checks or other financial records and an unknown number of computers; including any and all information and/or data stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer or with the aid of computer related equipment. This media includes but is not limited to floppy diskettes, fixed hard disks, removal hard disk cartridges, tapes, laser disks, video cassettes, optic media, and any other media which is capable of storing magnetic coding.

    Any and all electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data. These devices include, but are not limited to computers, computer components, computer peripherals, word processing equipment, modems, monitors, printers, plotters, encryption

12

circuit boards, optical scanners, external hard drives, and other computer related electronic devices.

Any and all instructions or programs stored in the form of electronic or magnetic media, which are capable of being interpreted by a computer or related components. The items to be seized include but are not limited to operating systems, application software, utility programs, compilers, interpreters and any other programs or software used to communicate with computer hardware or peripherals either directly or indirectly via telephone lines, radio, or other means of transmission. Any and all written or printed material which provides instructions or examples concerning the operation of a computer system, computer software, and/or any related device.

32. The computer forensic examiner will attempt to create an electronic "image" of all computers that are likely to store computer files described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The computer forensic examiner or another technical expert will then conduct an off-site search for the computer files described in the warrant from the image copy at a later date. If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of the computer system.

14